## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JUDITH SALAZAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 8057 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| COOK COUNTY SHERIFF'S | ) | |
| OFFICE and COUNTY OF COOK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Judith Salazar was a corrections officer ("CO") with the Cook County Sheriff's Office ("the Sheriff's Office") when she claims another CO made inappropriate sexual comments to her—both in person and via text message. When she relayed his behavior to a director in her office, the other CO was removed from his post, but Salazar contends supervisors and co-workers alike verbally abused her in response. When she filed an official complaint, she recounts, the behavior only continued.

Salazar was ultimately moved from her regular post and not allowed to return. As a result, she filed this suit against Cook County and the Sheriff's Office (collectively, "Defendants") bringing claims of hostile work environment based on sex and retaliation under both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. § 5/2-101 *et seq.* Defendants have moved for summary judgment on all claims. For the following reasons, this motion is granted in part and denied in part.

# I.    Background[1]

Judith Salazar was a CO in the Sheriff's Office from 2007 until November 2020. Defs.' LR 56.1 Statement Mat'l Fact ("DSOF") ¶ 3, ECF No. 48.  In August 2018, she was working on the Tails of Redemption ("TOR") tier, a unit within Division 9, a maximum-security division of the Cook County Jail.  *Id.* ¶ 15.  Salazar was the primary officer assigned to TOR and worked there five days a week.  Pl.'s LR 56.1 Resp. DSOF and Statement Additional Mat'l Fact ("PSOAF") ¶ 84, ECF No. 51.

TOR was a unique program where "detainees were responsible for caring for and training dogs that would otherwise have been euthanized." DSOF ¶ 18.  The parties dispute whether there are strict requirements for officers working on TOR, but Salazar testified that she needed several rounds of interviews and specialized training before beginning her work there.  *Compare* DSOF ¶ 20, *with* PSOAF ¶ 84. The parties do agree that COs who worked on TOR had the benefit of a partner, who assisted in carrying out job responsibilities.  It also meant that each CO had fewer detainees to supervise, "limit[ing] the potential for problems."  Defs.' Resp. PSOAF ¶ 82, ECF No. 58.

## A.    Interactions with CO Ferguson

Antonio Ferguson also was a CO assigned to work on TOR.  DSOF ¶ 22.  On August 13, 2018, Ferguson texted Salazar requesting "sexy pics."  *Id.* ¶ 23.  When Salazar declined to send him any pictures of herself, he called her a "stingy girl."  *Id.*

---

[1]    The following facts are undisputed or deemed admitted, unless otherwise noted.

Four days later, on August 17, 2018, Salazar and Ferguson were assigned to work a TOR shift together. *Id.* ¶ 25. During that shift, Ferguson approached Salazar while she was working with a detainee and said "let me get in your pants" and "let me get in you" multiple times. *Id.* Although Salazar does not know whether the contact was intentional, Ferguson's stomach or groin area brushed against her as he said this, and she had to "really push[] him back a little bit." *Id* ¶ 26. *See also* PSOAF ¶ 25.

Later that day or the next morning, Salazar saw Ferguson from across the parking lot after their shifts. PSOAF ¶ 28. He yelled "she's all mine now" in front of their coworkers. *Id.* ¶ 27. Afterwards, Salazar called Officer Derrick Rhodes, the man who had interviewed her for TOR, and told him about the multiple incidents with Ferguson. *Id.* ¶ 28. Ferguson was reassigned on August 20, 2018, and he never worked in TOR or with Salazar again, although he remained in Division 9. *Id.* ¶¶ 28–31.

## B. Working Environment After Ferguson's Transfer

The same day that Ferguson was reassigned, Lieutenant Brian Bialczak, the designated shift commander for Salazar's shift in Division 9, approached her "red in the face, frowning and upset." DSOF ¶ 16; PSOAF ¶ 91. In front of all other COs on duty, he asked "why the fuck did you get Ferg kicked out of TOR?" PSOAF ¶ 91. Another superior officer, Sergeant Michael Manade, added "Salazar, damn, got Ferg kicked out, man, that's terrible, that's terrible." *Id.* Salazar claims that Bialczak and

Manade had a group of close friends at work, including some of her fellow COs, who were known for going out drinking together after work. *Id.* ¶ 95.

After the August 20 interactions with Bialczak and Manade, Salazar claims, the COs started treating her differently. Among other things, she says they refused to stand near her—or even speak to her—at roll call. *Id.* ¶ 34. In fact, she testified that when one CO did stand by her during roll call, another CO "guid[ed] him away" from her, saying "don't talk to her, she'll accuse you of sexual harassment." *Id.* ¶ 35. Salazar says that one lieutenant, Michael Matanic, witnessed these incidents and laughed out loud. *Id.* ¶ 93. Furthermore, "many times" when everyone was clocking out after a shift, the other COs would approach Salazar and say "snitches get stitches"—a phrase used by gang members to indicate that those who report on others will be harmed. *Id.* ¶ 34. The supervisors also stopped sending another CO to cover for Salazar during her lunch break, which meant she could not take one. DSOF ¶ 48.

Nearly two weeks later, on August 31, 2018, CO Philippe Mainz approached Salazar at the beginning of her shift. He told her that "the Division 9 supervisors were out to get her and would not come if she needed help." DSOF ¶ 42. He also told her to "get out of there for your own safety." PSOAF ¶ 42.

Sometime in early September, Salazar reached out to Rhodes again to complain about the way she was being treated. PSOAF ¶ 50. She explained she "want[ed] to file complaints and ha[d] already reached out to an attorney because [she] fe[lt] like she [wa]s being harassed, discriminated against and retaliated against

4

for speaking out about prior situations." *Id.* She asked for the proper procedures and paperwork to file a formal complaint. *Id.*

Rhodes forwarded her complaints to Deputy Chief Operating Officer Tarry Williams, one of the developers of the TOR program. DSOF ¶ 18; PSOAF ¶ 50. Williams, in turn, forwarded the message to Superintendent Jason Cianciarulo, who oversaw Division 9 operations, on September 23, 2018. PSOAF ¶ 50. Cianciarulo then met with Salazar on September 25 or 26, 2018, and gave her the information necessary to submit a formal complaint. *Id.* ¶ 51.

On October 17, 2018, Plaintiff filed eight formal complaints about her treatment in Division 9. *Id.* ¶ 53. The Office of Professional Review ("OPR") contacted Salazar after she filed her complaints and met with her on November 7, 2018. PSOAF ¶ 56.

## C. Removal from TOR

Salazar testified that after she filed her official report, the negative treatment at Division 9 intensified. For example, she once came back to her desk to find that the screws had been removed from her chair so that it would fall apart when she sat down and heard two other COs laughing behind her. PSOAF ¶ 105. The COs would now stand opposite her at roll call, leaving her completely isolated. *Id.* And none of her fellow officers would look at her or speak to her. *Id.* This made Salazar feel unsafe at work. *Id.*

On December 5, 2018, CO Kirk Ortiz approached her and told her she needed to "watch [her]self, be careful," because Ferguson and Bialczak had gone to talk to an

inmate about her. *Id.* ¶ 106. This also made Salazar feel unsafe, and so she relayed the information to her supervisors. *Id.*

Around the same time, TOR closed temporarily, and Salazar had to work with the general population of COs, rather than just those on the smaller TOR team. *Id.* She then asked OPR to temporarily transfer her. *Id.* ¶ 108.

Although Salazar never specified in writing how long she hoped her "temporary" transfer would be, according to notes from the Human Resources specialist in charge, Salazar was "requesting a temporary move while the Tails of Redemption Program, TRP, is shuttered." *Id.* Salazar was moved to Division 5. *Id.* ¶ 111.

TOR reopened on January 10, 2019, but Salazar was never transferred back. *Id.* ¶ 109. To return to TOR, Salazar submitted a bid to return to Division 9 because TOR was in Division 9. *Id.* ¶ 114. She was moved back to Division 9 on March 17, 2019, *id.,* and Salazar asked multiple times throughout March and April to be placed back on the TOR tier, but nothing ever came of it. Indeed, the people who had the power to return her to TOR—Bialczak, Williams, and Director of Human Resources Matthew Burke—all were aware of Salazar's previous complaints. *Id.* ¶ 117.

## II. <u>Legal Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other

written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)).

To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III.   Analysis

Plaintiff brings a series of claims under Title VII and the IHRA based on her treatment both before and after her efforts to report Ferguson for his sexually explicit statements. She argues that his statements resulted in a hostile work environment

7

based on her sex. She further contends that once she reported Ferguson, she was subject to retaliation in two ways. She was subjected to a hostile work environment, and she was removed from TOR.[2]

### A. Hostile Work Environment Based on Ferguson's Comments (Claim 1)

The Court begins with Salazar's claim that Ferguson's behavior—both inside and outside the workplace—created a hostile work environment based on her sex. "Surviving summary judgment on a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class . . . (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 600 (7th Cir. 2014) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014))).

The parties dispute whether Salazar has offered enough evidence of a hostile work environment to survive summary judgment. But the Court need not reach this issue, because Salazar cannot establish any basis for employer liability for Ferguson's behavior.

Under both Title VII and the IHRA, an employer's liability for workplace discrimination is determined, in part, by the position of the person committing the

---

[2]    Salazar brings her claims under both Title VII and the IHRA, but "[t]he analytical framework for [Title VII and the IHRA] is 'essentially identical,' and therefore we need not analyze them separately." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 n.39 (7th Cir. 2016) (quoting *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 n.1 (7th Cir. 2012)). Throughout this opinion, the Court will consider Salazar's claims under Title VII and the IHRA with the same analysis, noting any divergence where necessary.

harassment. Employers are strictly liable for discrimination committed by supervisors. *See Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017). By contrast, employers are liable for discrimination committed by coworkers of the complainant "only if [the employers are] 'negligent either in discovering or remedying the harassment.'" *Id.* (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011)). And "[a]n employer is negligent in remedying harassment if 'it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" *Saxton v. Wolf*, 508 F. Supp. 3d 299, 311 (N.D. Ill. 2020) (quoting *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th Cir. 2016)).

Ferguson was Salazar's coworker, not her supervisor. PSOAF ¶ 23. Accordingly, the Sheriff's Department is liable for Ferguson's behavior only if it was negligent in uncovering or addressing it. *See Saxton*, 508 F. Supp. 3d at 311.

For her part, Salazar argues that the Sheriff's Office was negligent in addressing Ferguson's harassment because "nothing was done" in response to her complaints. *See* Pl.'s Mem. Opp. Summ. J. ("Pl.'s Mem.") at 11, ECF No. 56. But it is undisputed that Ferguson was removed from his position on TOR three days after Salazar complained of his inappropriate behavior. DSOF ¶ 29.[3] Indeed, she never

---

[3]  Salazar seems to suggest that Ferguson was moved for other reasons. But Salazar herself testified that when she called Director Derrick Rhodes, the head of TOR, to inform him of the August 2018 incidents and her concerns, Rhodes told her that he "would take care of it." Judith Salazar Dep. Pt. 1 (Salazar Dep. 1) at 101:5–10, ECF No. 52-4. In light of this conversation, and the timing of Ferguson's removal, no reasonable inference can be made that the Sheriff's Office was not responding to Salazar's concerns. *See St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 (7th Cir. 1997) ("Although the non-movant is entitled on a motion for summary judgment to have all reasonable inferences drawn in its favor, . . . the court is not required to draw unreasonable inferences from the evidence.").

had to work another shift with him directly. *Id* ¶ 31. Ferguson's reassignment was both "prompt" and "reasonably likely to prevent the harassment from recurring." *See*, *e.g.*, *Jarvis v. Sigmatron Int'l Inc.*, 223 F. Supp. 2d 981, 987 (N.D. Ill. 2002) (finding an employer non-negligent when its actions prevented further interaction between the victim and the alleged harasser, even though these actions were not taken until the victim made a second complaint). And while Salazar argues that the Sheriff's Department was negligent for failing to investigate her complaints, these arguments are directed towards her later complaints of retaliation by others, rather than of Ferguson's remarks. *See* Pl.'s Mem. at 11. What is more, she points to no evidence that Defendants knew or should have known about a risk of harassment in TOR prior to her 2018 altercations with Ferguson, which were promptly handled. Because no reasonable jury would find employer liability on this record, Claim I is dismissed.

## B. Retaliatory Hostile Work Environment

After she reported Ferguson's inappropriate behavior, Salazar alleges that her day-to-day experience only got worse. Based on this, she brings a claim of retaliatory hostile work environment.

"To prove a retaliatory hostile work environment, [a plaintiff] must show that (1) her work environment was both objectively and subjectively offensive; (2) the harassment was in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Flanagan v. Off. of Chief Judge,* 893 F.3d 372, 375 (7th Cir. 2018). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact

for the jury." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

### 1. Objectively and Subjectively Offensive

The analysis begins with whether Salazar's work environment was both objectively and subjectively offensive. This is considered under a totality of the circumstances approach and requires the same level of hostility as a hostile work environment claim that is based on race or sex. *See Boss*, 816 F.3d at 920.

Salazar easily clears this hurdle. Among other things, she asserts that her fellow COs refused to speak to her, PSOAF ¶ 35, that they isolated her at morning roll call, *id.*, and that her superiors told other officers not to speak to her because she would accuse them of sexual harassment. *Id.* A reasonable person would find these things offensive. And these actions were unquestionably subjectively offensive—Salazar repeatedly testified at her deposition that she felt these actions were threatening and that her treatment made her feel unsafe. PSOAF ¶ 105.

### 2. Causation

The Court next considers whether the harassment was actually in retaliation for her protected behavior. "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "In other words, would [Salazar] have not [experienced a hostile work environment] if [s]he did not complain about the [Ferguson] incident." *Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019). A plaintiff can prove causation through both direct and circumstantial evidence. *See Ortiz v. Werner Enters., Inc.*,

834 F.3d 760, 765 (7th Cir. 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence.").

Here, Defendants insist that Salazar has failed to prove causation "because there is no evidence that . . . any of the individuals whose conduct Plaintiff complains about were aware that she made a complaint about allegedly unlawful employment practices." Def.'s Mem. Supp. Summ. J. at 8, ECF No. 47; DSOF ¶¶ 54; 55. Essentially, Defendants argue that because Plaintiff's alleged harassers did not admit to knowing about her complaints at the time of her alleged harassment, she cannot prove causation. That is incorrect.

Salazar has presented enough circumstantial evidence to allow a reasonable jury to infer that, but for her complaints about Ferguson,[4] the other members of Division 9 would not have treated her the way that they did. According to Salazar,

---

[4]    Defendants also incorrectly suggest that the correct timeline for any retaliation claim would be after Plaintiff complained to her supervisor in September 2018. *See* Def.'s Mem. at 8. But a complaint need not be formal in order to constitute protected activity for the purposes of Title VII. Rather, the question is whether Salazar, through her initial report of Ferguson's inappropriate actions in August 2018, "adequately alerted [the Sheriff's Office] to the harassment, thereby satisfying [her] obligation to avoid the harm, not whether [she] followed the letter of the reporting procedures set out in the employer's harassment policy." *Mashni v. Bd. of Educ. of City of Chi.*, No. 15 C 10951, 2017 WL 3838039, at *14 (N.D. Ill. Sept. 1, 2017) (quoting *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005)). "At bottom, the employer's knowledge of the misconduct is what is critical, not how the employer came to have that knowledge." *Cerros*, 398 F.3d at 952. It is undisputed that Salazar conveyed the incidents with Ferguson to Rhodes, who had held himself out as a Director within the Sheriff's Office, and who was identified as a director as part of the internal investigation into Salazar's complaints. *See* PSOAF ¶¶ 90; 98. Accordingly, the appropriate date to consider the beginning of potential retaliation would be August 20, 2018, when Plaintiff returned to work for the first time after reporting Ferguson's behavior. *See* DSOF ¶ 29.

Bialczak approached her at the first opportunity after her informal report and asked, in front of everyone in the division, "why the fuck did you get Ferg kicked out of [Tails of Redemption]?"  PSOAF ¶ 91.  Similarly, Manade said, in front of the entire division, "Salazar . . . got Ferg kicked out[.]"  *Id*.  She further testified that her coworkers approached her and said "snitches get stitches."  PSOAF ¶ 93.  Salazar also recalls that Bialczak would move other officers away from her during roll call, while another officer said "[d]on't stand by her; she'll accuse you of sexual harassment."  PSOAF ¶ 94.  A reasonable jury could infer from these statements that not only Bialczak and Manade, but everyone in the division, knew that Salazar had complained of Ferguson's behavior and acted on that knowledge.

### 3.  **Severe or Pervasive Behavior**

The next issue is whether the offending "conduct [was] sufficiently severe or pervasive to alter the conditions of [Salazar's] employment such that it create[d] an abusive relationship."  *Huri v. Off. of the Chief Judge*, 804 F.3d 826, 834 (7th Cir. 2015).  "Whether conduct meets this bar depends on 'the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance.'"  *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009)).

Taking the record in the light most favorable to Plaintiff, these factors all suggest that Salazar's work environment was hostile.  As for the first two factors— severity and frequency of the retaliatory conduct—there is no set number of instances

13

that a Plaintiff must satisfy to establish a hostile work environment; rather, severity and frequency are considered "'inversely related.' . . . A 'severe episode' that occurs 'as rarely as once' and a 'relentless pattern of lesser harassment' both may violate Title VII." *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017) (quoting *Cerros*, 398 F.3d at 951). And the Seventh Circuit has found that intentionally isolating a worker over a period of time can contribute to a hostile work environment. For example, in *Hall v. City of Chicago*, 713 F.3d 325 (7th Cir. 2013), the plaintiff's "colleagues were forbidden from speaking to her, she was prohibited from Division meetings, her efforts to take on more work were suppressed, and [her supervisor] subjected her to occasional verbal outbursts." 713 F.3d at 331. Based upon this and similar conduct, the Court found that "a jury could conclude [the supervisor's] conduct was designed to ostracize her from the rest of the Division" and could constitute a hostile work environment. *Id.*

Salazar describes a similar campaign of harassment and isolation that occurred over the course of several months. She states that, starting as soon as Ferguson was removed from TOR, other officers refused to speak to her and implied that she was a "snitch," PSOAF ¶¶ 92–93; higher-ranked officers kept her peers from speaking to her, PSOAF ¶¶ 93–94; and those same higher-ranked officers stopped sending relief for Plaintiff so that she could take her lunch break. PSOAF ¶ 97. This occurred at least twice a week for two months. Salazar Dep. 1 at 141:6–7, ECF No. 52-4. By the end of her first stint at Division 9, the statements were happening so frequently that Salazar "would just pray" that she could get through her day "without

14

somebody saying or doing something." PSOAF ¶ 93. As Salazar tells it, her decision to submit a formal complaint in October 2018 only exacerbated the treatment—nobody would look at her or speak to her; fellow COs refused to even stand next to her during morning roll call; her office furniture was sabotaged. PSOAF ¶ 105.[5] Just as in *Hall*, Salazar experienced isolation from her coworkers combined with "occasional verbal outbursts" from supervisors at roll call. Accordingly, there is a question of fact as to whether Salazar's working conditions were sufficiently "severe and pervasive" to constitute a hostile work environment.

The next two issues, whether the conduct that Salazar describes was "physically threatening or humiliating or merely offensive," and whether it interfered with her job performance, are also best taken together. In Salazar's case, "[i]t is . . . significant that the harassment occurred in an atmosphere where [officers] . . . serve together and in which mutual interdependence is an essential factor in effectiveness and, at times, survival." *Alamo v. City of Chi.*, No. 12-CV-4327, 2021 WL 633355, at *7 (N.D. Ill. Feb. 18, 2021) (quoting *Alamo v. Bliss*, 864 F.3d 541, 551 (7th Cir. 2017) when denying a subsequent motion for summary judgment). In *Alamo*, the court found that a combination of physically threatening and harassing behavior was

---

[5]     To the extent that Defendants attempt to limit the retaliation claims to the time period after Salazar's formal report, they are taking too myopic a view of the case. "[C]ourts should not carve up incidents of harassment then separately analyze each one." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (citing *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 (7th Cir. 2011)). Here, a reasonable jury could infer that harassment began after Salazar informally complained about Ferguson and intensified after her official reporting. These incidents are taken together.

particularly concerning in a fire department, where unity on the job could often be a question of life or death. *Id*.

Similarly, here, in addition to repeated harassment from her fellow COs, Salazar has reason to fear that her supervisors would abandon her, should she be in danger while on the job. Specifically, Mainz told her that "the Division 9 supervisors were out to get her and would not come if she needed help." DSOF ¶ 42. He explicitly warned her "[i]f you get bit by a dog or an inmate attacks you, [the supervisors] are not coming for you." Salazar Dep. 1 at 135:11–12. As in *Alamo*, this was both physically threatening and interfered with her work with inmates. Accordingly, Salazar has offered evidence of more than "non-threatening, non-humiliating conduct," *Boss*, 816 F.3d at 920–21, and raises a genuine issue for the jury as to whether she was subjected to physically threatening treatment which interfered with her job performance.

These four factors, taken together, create a triable issue as to whether the hostility in Salazar's work environment was sufficiently severe or pervasive to constitute violations of Title VII and the IHRA.

### 4. Employer Liability

Finally, the Court considers whether Salazar has presented sufficient evidence of employer liability for her hostile work environment claims. The parties disagree over whether Bialczak, Manade, and Matanic were Salazar's supervisors or her coworkers. And this disagreement is material—as previously explained, if the offending employee is a supervisor, then the employer is strictly liable. *See Nischan*,

16

865 F.3d at 930.  By contrast, if the offender is the victim's coworker, employers are only liable if they acted negligently in discovering or investigating the harassment. *Id.* (quoting *Vance*, 646 F.3d at 470).

"To prove negligence [by the employer], the plaintiffs must show that (1) the defendants knew or should have known about the harassment and (2) failed to take reasonable steps to prevent it."  *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 607 (7th Cir. 2021).  And while "a prompt investigation is the hallmark of a reasonable corrective action," *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (quotations omitted),  reasonableness is a "fact-bound inquiry," considered under the totality of the circumstances, including "the gravity of the harassment." *Howard*, 989 F.3d at 608.  At its core, what matters is whether the employer's response was "reasonably calculated to prevent further harassment . . . at the time the allegations are made." *Cerros*, 398 F.3d at 953.

Here, the Court need not decide whether these officers were Salazar's supervisors,[6] because she has offered sufficient evidence for a reasonable jury to infer that the Sheriff's Office acted negligently in investigating Salazar's hostile work environment claims.  In particular, Salazar has offered evidence that the Sheriff's Office did not promptly respond to her OPR complaint of a hostile work environment.

---

[6]     Although the Court does not reach this issue, it bears noting that the inquiry could differ between Title VII and the IHRA. *Compare Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) ("[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."), *with Hilgers v. Rothschild Inv. Corp.*, No. 15 C 3572, 2017 WL 4164036, at *8 (N.D. Ill. Sept. 20, 2017) ("[U]nder the IHRA, a person is a supervisor as long as he or she works for the employer in some general supervisory role.").

By October 17, 2018, Salazar had filed a formal complaint about the incidents in Division 9. PSOAF ¶ 53. And her superiors had reason to know about her isolation from her coworkers as early as September 2018, *see* DSOF ¶ 50, and about the statements that she would not get needed support as early as October 3, 2018, *see* Pl.'s Resp. DSOF ¶ 52, ECF No. 51. Defendants argue that they responded with an investigation, as evidenced by Robinson's call to Salazar on October 26, 2018. DSOF ¶ 56. But Robinson did not meet with Salazar until November 7, 2018, nearly two weeks later. *Id.* And all the while, Salazar was still working with her alleged harassers every day, in an environment where their support and assistance could be needed at any moment. A reasonable person could consider this an unacceptable delay. *See, e.g.*, *Carter v. Dart*, 262 F. Supp. 3d 713, 723 (N.D. Ill. 2017) (finding that negligence was a question for the jury where supervisors left up harassing photographs around the workplace for at least a week without taking corrective action).

Moreover, a jury could find that the Sheriff's Office's inaction during those weeks was not "reasonably calculated to prevent further" hostility towards Salazar. Indeed, Robinson herself admitted that the first "corrective action" she took was to move Salazar away from the environment of Division 9—an act that didn't happen until December 14, 2018, more than two months after the official complaint, and which *Salazar herself had to request. See* DSOF, Ex. 3, Excerpts of Mary Robinson's Deposition ("Robinson Dep.") at 110:8–15, ECF No. 48-4. *Cf. Lapka v. Chertoff*, 517 F.3d 974, 985 (7th Cir. 2008) (finding an employer was non-negligent because "taking

effective steps to physically separate employees and limit contact between them can make it 'distinctly improbable' that there will be further harassment").

Because Salazar can make a claim for employer liability, regardless of the status of her purported harassers, the motion for summary judgment as to the retaliatory hostile work environment claim is denied.

## C.    Retaliatory Removal from TOR

Salazar's final retaliation claim is based on her removal from the TOR program.  She argues that the Sheriff's Office's refusal to move her back to her regular shift on TOR—which allowed her to work on a high-profile program while supervising with fewer inmates—was an intentional decision designed to punish her for her OPR complaint.  In order to survive summary judgment on a retaliation claim, Salazar must show: "(1) she engaged in a protected activity; (2) [the Sheriff's Office] took an adverse employment action against her; and (3) there was a causal connection between the two."[7]  *Bagwe*, 811 F.3d at 887–88.  In this case, Defendants concede that Salazar's OPR complaint was protected behavior for the purposes of Title VII and the IHRA, and only the latter two prongs are at issue.

### 1.    Adverse Employment Action

The first question is whether the decision not to move Salazar back to her regular shift on TOR constitutes an adverse employment action.  The Seventh Circuit has recognized adverse employment actions where "the conditions in which [a

---

[7]     This is the so-called "direct method" of proving retaliation.  *Bagwe*, 811 F.3d at 887. Because Salazar has not pointed to any similarly situated individuals who complained about the work environment and did not have their shifts changed, she cannot proceed under the indirect method.  *Id.*

plaintiff] works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment" or where "a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted." *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004); *see also McQueen v. City of Chi.*, No. 09 C 2048, 2014 WL 1715439 at *2 (N.D. Ill. Apr. 30, 2014). These changes must be objectively negative, rather than simply subjectively less preferable. *See McQueen*, No. 09 C 2048, 2014 WL 1715439 at *2. Salient here, "[w]ork schedule changes or shift changes may be actionable adverse actions only in 'unique circumstances,' such as where the employer implements the change to exploit a 'known vulnerability.'" *Owusu v. Cook Cnty.*, 211 F. Supp. 3d 1004, 1009 (N.D. Ill. 2016) (quoting *Porter v. City of Chi.*, 700 F.3d 944, 945 (7th Cir. 2012)).

In this case, Salazar offers evidence that being moved from TOR subjected her to an "unsafe . . . or otherwise significantly negative alteration in her workplace environment. *O'Neal*, 392 F.3d at 911. Indeed, the parties agree that "the ratio of officers to inmates in [TOR] was lower than that of a general population tier for safety and security reasons," which "limits the potential for problems." Def.'s Resp. PSOAF ¶ 82, ECF No. 58. And Defendants themselves note that Division 9 is a maximum-security portion of the jail, heightening the risks to officer safety and security. *See* DSOF ¶ 15. A reasonable jury could find that, because she was kept in Division 9,

Salazar was at higher risk of a physical altercation with inmates and, accordingly, suffered an adverse employment action. *See Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009) (holding that whether a particular action was an adverse employment action could be a jury question).

What is more, TOR was characterized as a "high visibility" program and was closely associated with Sheriff Dart himself. PSOAF ¶ 83. This, taken with her specialized training for the program, could lead a reasonable jury to believe that a lateral move away from TOR could negatively impact Salazar's career advancement opportunities and leave her "skills likely to atrophy." *See Lewis*, 496 F.3d at 654 (7th Cir. 2007) (finding a genuine issue of material fact as to whether a police officer had suffered an adverse employment action where she was denied access to a particular training which could hinder "her ability to move forward in [one] component of her career"). On these grounds, too, a jury could find that Salazar had suffered an adverse employment action.

**2. Causation**

The final element of Salazar's retaliation claim is whether the refusal to allow her back on TOR was caused by her protected conduct—that is, to her OPR report. Defendants rely on *Brown v. Advocate South Suburban Hospital*, arguing that Plaintiff has failed to "produce evidence that a retaliatory motive actually influenced the decision-maker, not merely that it could have." 700 F.3d 1101, 1108 (7th Cir. 2012). But the plaintiffs in *Brown* offered no evidence that the decisionmakers were aware of their complaints. *See id*. Not so here. Plaintiff points to two officers who

had the power to place her back on TOR but chose not to: Williams and Bialczak. *See* PSOAF ¶ 117. Williams was undisputedly aware of Salazar's complaints, as she had made them to him explicitly. *See id.* ¶ 115. And although the timeline is not clear, Salazar testified that sometime after her meeting with Cianciarulo regarding her complaints, Bialczak looked at her directly during roll call and said "listen up, if you think . . . that if you e-mail the higher-ups and we're not going to find out, you're wrong, and you'll fucking—you'll be fucking dealt with." PSOAF ¶ 103. Furthermore, Bialczak does not deny that Cianciarulo told him about Salazar's complaints; rather, he testified that he could not remember one way or the other. *See* Defs.' Resp. PSOAF ¶ 103. From these facts, a reasonable jury could find that Bialczak had actual knowledge of Salazar's OPR complaints. Thus, when the record is taken in the light most favorable to Salazar, it shows that the officers with control over her return to TOR knew about her complaints and at least one of them had previously threatened that she would be "fucking dealt with" for those same complaints. This is enough to survive summary judgment on causation.

## D. Indemnification

Because Defendants' motion for summary judgment as to the indemnification count against Cook County was predicated on the dismissal of all of Plaintiff's claims, and all but one of Plaintiff's claims will survive summary judgment, that motion is similarly denied.

## IV.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Salazar's claims of hostile work environment based on sex, insofar as they are predicated on Officer Ferguson's actions in August 2018. In all other respects, Defendants' motion is denied.


**IT IS SO ORDERED.**              **ENTERED:  3/24/22**

**John Z. Lee**
**United States District Judge**